**ZURN CONSTRUCTORS, INC., d/b/a Vinylplex, Plaintiff,**

v.

**The B.F. GOODRICH COMPANY, Defendant.**

Civ. A. No. 88–2071.

United States District Court, D. Kansas.

March 24, 1988.

Mark D. Hinderks, Stinson, Mag & Fizzell, Overland Park, Kan., John M. Edgar, Julie M. Cheslik, Craig S. O'Dear, Stinson, Mag & Fizzell, Kansas City, Mo., for plaintiff.

Walter J. Kennedy, Thomas M. Bradshaw, Kathleen A. Clark, Hoskins, King, McGannon & Hahn, Kansas City, Mo., C. Owen Paepke, Ray K. Harris, Fennemore Craig, Phoenix, Ariz., for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter is presently before the court on plaintiff's motion for a preliminary injunction against defendant B.F. Goodrich Company requesting (1) that defendant continue supplying plaintiff with polyvinylchloride (PVC) powder compound pursuant to the terms of a February 15, 1982, contract until defendant Goodrich properly terminates the contract or until the merits of the case are decided at trial, whichever occurs first, and (2) that defendant Goodrich specifically comply with the Most Favored Nations provision of the February

15, 1982, contract. The parties were allowed to engage in limited, accelerated discovery to prepare for a hearing on plaintiff's preliminary injunction motion, which hearing was held March 3, 1988. After considering the parties' briefs, oral arguments, and exhibits, we are now prepared to rule on this motion and make the following findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiff Vinylplex is one of several divisions of Zurn Constructors, Inc., a California corporation. Zurn Constructors is a wholly-owned subsidiary of Zurn Industries, Inc., a Pennsylvania corporation. Vinylplex's principal place of business is located in Pittsburg, Kansas. At its plant in Pittsburg, Kansas, Vinylplex manufactures polyvinylchloride (PVC) pipe, which pipe is sold to contractors and distributors for use as sewer and water pipes. The essential raw material used to manufacture PVC pipe is PVC pipe grade resin, which is combined with certain additives to make PVC pipe compound. Vinylplex converts the PVC compound into PVC pipe through an extrusion process.

2. Defendant Goodrich is a New York corporation with its principal place of business located in Ohio. Goodrich, a large diversified corporation, has a business group known as the GEON Vinyl Division, which produces various grades of PVC resin and compound. Pipe grade resin is used to manufacture PVC pipe, while higher grade PVC resins are used in other manufacturing processes and for other applications.

3. Because Vinylplex does not have the capability of blending PVC resin with the necessary additives to produce PVC compound, it must purchase blended PVC compound from a limited number of suppliers who can provide this material.

4. Vinylplex employs fifty-three people at its plant in Pittsburg, Kansas, forty of whom are directly involved in production (four production crews of approximately ten people each), and thirteen of whom are management, sales and clerical personnel. The plant currently operates at full capacity; i.e., seven days per week, twenty-four hours per day. To operate at full capacity, Vinylplex requires an average of 14–16 standard railcars of PVC compound per month. Because of the substantial costs of starting up and shutting down the plant, a full capacity production schedule allows the plant to be operated at optimum efficiency and profit levels. Additionally, the low profit margins in the PVC conversion business necessitate that the plant operate at full capacity in order for the fixed production costs to be allocated over the maximum pounds of production, thus allowing Vinylplex to achieve competitive per-unit production costs. In the past, when market demand made it impossible for Vinylplex to sell its full-capacity output, Vinylplex operated its plant at less than full capacity and suffered financial losses as a result. Current market demand for PVC pipe is high, and this strong demand is projected to continue until 1990. Consequently, Vinylplex must operate at full capacity to take advantage of the high demand and the resulting profits in order to balance out the losses normally experienced during low demand periods.

5. Prior to 1981, Vinylplex obtained its PVC compound from Diamond Shamrock in Deer Park, Texas. After Goodrich acquired the Deer Park PVC resin manufacturing and powder blending facilities in late 1981, Vinylplex began purchasing its PVC powder compound from Goodrich.

6. In mid-December 1981, Vinylplex and Goodrich began negotiating a long-term PVC compound supply contract. On or about February 15, 1982, the parties entered into a supply contract. The five contract provisions relevant to plaintiff's motion are as follows:

a. The parties agreed to an "evergreen" provision.[1] This "evergreen" clause pro-

---

1. A. *Delivery Period*

   This contract will be in effect for a primary period of one (1) year beginning March 1, 1982 to February 28, 1983 and, in effect, thereafter on a year-to-year basis, subject to termination by either party giving the other sixty (60) days written notification. Seller and Buyer agree to meet at least sixty (60)

vides a one-year primary contract from March 1, 1982, to February 28, 1983. This contract is automatically renewed for another year, unless either party gives written notice of termination at least sixty days prior to the February 28th expiration date.

b. The parties also agreed to a post-termination supply provision, which entitles Vinylplex to a continuing supply of PVC compound for nine months if Goodrich terminates the contract under Amendment A.[2] This provision allows Vinylplex sufficient time to secure a replacement resin supply in the event of termination. Reading Amendments A and I together, Goodrich could only terminate the contract by giving written notice on or before December 31st, and would be obligated to supply Vinylplex's compound needs through November of the following year.

c. The contract contains a competitive offer clause which allows Goodrich three options if Vinylplex receives and accepts a written competitive offer from a major domestic PVC resin producer for any of the PVC compound remaining to be supplied under the Goodrich contract.[3] If Vinylplex

gives written notice to Goodrich stating Vinylplex's intent to purchase a specific quantity from the competitive supplier and stating all the terms and conditions of the offer, Goodrich could: (1) meet the competitive offer; (2) not meet the competitive offer and allow Vinylplex to purchase from the other supplier, but continue to supply Vinylplex the balance of its PVC compound requirements; or (3) cancel the contract.

d. The pricing clause provides that the PVC compound price would consist of a negotiated net PVC resin price plus an "add-on" charge for blending the PVC resin into PVC compound.[4] Additionally, the pricing provision requires the parties to negotiate the PVC resin price on a monthly basis. Generally speaking, these negotiations took place by telephone, with Vinylplex's general manager informing Goodrich of the going market price.

e. Finally, the parties agreed to a Most Favored Nations clause, which, under certain circumstances, entitles Vinylplex to receive the lowest PVC resin price Goodrich was giving any customer.[5]

days prior to anniversary ending date for the purpose of negotiating terms for subsequent years.

**2.** I. If Seller terminates contract under Amendment A, Seller will supply product and quantity for a period of 9 months from the termination date under the terms of this contract.

**3.** D. *Competitive Offer*

If buyer receives a written offer from a major domestic producer not controlled by or controlling the buyer, to supply, in place of seller, *any of* all the goods remaining to be supplied hereunder which are of like quality, for a like use and deliverable in like quantities, at a delivered cost less than the then effective delivered cost hereunder, upon buyer's written notice stating all the terms and conditions including the quantity the buyer intends to purchase of the competitive offer, seller shall by notice within three (3) days of receipt of buyer's notice (a) meet the competitive offer and amend this contract accordingly, (b) choose not to meet and deduct from the seller's maximum obligation to supply the quantity that the buyer intends to purchase from the competitive source, or (c) cancel the contract. By definition, a major domestic producer is any domestic producer with published PVC resin capacity in excess of 2,000,000 pounds annually.

NOTE: The words "any of" were substituted for the word "all," which substitution was initialled and approved by William A. Freeman, the general manager of the Vinylplex plant at the time of the contract. Mr. Freeman is now the chief financial officer of Zurn Industries, Inc.

**4.** B. *Amendment to Price Section—Price of Goods*

The price basis of PVC compounds sold in this Contract shall be the combination of a negotiated net PVC resin price (the delivered price less any and all discounts) and an "add-on".…
It is the intent of both parties to negotiate the net PVC resin price in effect for each calendar month.

**5.** B. *Amendment to Price Section—Price of Goods*

. . . .
Seller agrees that, if at any time during the term of this agreement, it sells resin or compound of like quality to pipe customers at a price more favorable than that then in effect hereunder, Buyer shall be entitled to the benefit of such more favorable price with respect to an equivalent volume of resin or compound, and this agreement shall be deemed modified accordingly.

7. The "evergreen" and Most Favored Nations provisions are not typical provisions for Goodrich PVC resin supply contracts. In 1984, Goodrich decided it was unhappy with the contract terms and attempted to renegotiate its terms with Vinylplex. Vinylplex did not wish to modify the contract, however, and Goodrich continued to supply Vinylplex with PVC compound pursuant to the February 15, 1982, contract.

8. By June 1986, Robert Rosenau, Goodrich's senior marketing manager for PVC pipe and siding resin and compound sales, and Frank DeWolf, Mr. Rosenau's superior and Director of Marketing for vinyl resins, again began discussing the unfavorable contract with Vinylplex. According to an internal Goodrich "strategy summary" developed in approximately June 1986, Goodrich planned to cancel the Vinylplex contract early and renegotiate it in 1987 because Goodrich considered the contract to be unprofitable. Mr. Rosenau and Mr. DeWolf testified they understood that if Goodrich chose to terminate the contract under Amendment A's evergreen provision, Goodrich would be obligated to supply Vinylplex with PVC compound through November 1987, pursuant to Amendment I. On the other hand, both Messrs. Rosenau and DeWolf testified that they understood cancellation of the contract under Amendment D would result in immediate termination of Goodrich's supply obligations.

9. In early April 1987, Vinylplex received via telephone a spot offer from Shintech, another major domestic producer of PVC resin, for six railcars of resin for 30¢ per pound. On or about April 6, 1987, Jack Freeman, general manager of the Vinylplex plant, called Mr. Rosenau to discuss an order for 4.2 million pounds of PVC compound. Pursuant to Vinylplex's general practice under Amendment B of the February 15, 1982, contract, Mr. Freeman informed Mr. Rosenau that the current competitive market price for PVC resin was 30¢ per pound, and requested Goodrich to supply Vinylplex's next order at that price. Although Goodrich had usually acquiesced to the market price in the past, the price differential between Goodrich's price and Mr. Freeman's understanding of the competitive market price was unusually large in April 1987; thus, Mr. Rosenau informed Mr. Freeman that he would call back with regard to the 30¢ per pound price.

10. On or about April 9, 1987, Mr. Rosenau called Mr. Freeman to continue price negotiations. Mr. Rosenau informed Mr. Freeman that Goodrich could not meet the 30¢ price. Mr. Freeman reiterated that he considered the 30¢ price to be the current market price, and also told Mr. Rosenau about Shintech's spot offer for six railcars at 30¢ per pound. Pursuant to Goodrich's standard policy in negotiation situations where wide price differentials existed, Mr. Rosenau requested that Mr. Freeman confirm their telephone negotiations and the Shintech offer in writing. Upon receipt of this written confirmation, Mr. Rosenau was going to discuss the pricing negotiations with his superiors.

11. Mr. Freeman sent the requested written confirmation in a letter dated April 9, 1987. This letter stated in pertinent part:

Dear Rob:

I have received a firm competitive offer to purchase 6 railcars of resin to ship in April at 30 cents per pound. I understand this to be your competitions [sic] market price for April.

Rob, I can see your reluctance to accept this as market price. My information sources indicate March resin market prices in the 29.5 to 30 cent range. BFG's firm price in March to Vinylplex was 32 cents for resin. I am not comfortable with your position that Vinylplex is receiving the "real" market price. In order to maintain a competitive position in the pipe market, Vinylplex must be getting the "real" market price. I *cannot* ignore 3 cents per pound difference in resin price.

*See* Exhibit 2.

12. Meanwhile, shortly after his April 9th telephone conversation with Mr. Freeman, Mr. Rosenau called Ray Walker, Goodrich's regional account executive who handled the Vinylplex account. According

to Mr. Walker's deposition testimony, Mr. Rosenau recounted his discussion with Mr. Freeman and informed Mr. Walker that he requested written confirmation of the competitive offer for the purpose of invoking Amendment D's cancellation provision. *See* Walker deposition, pp. 68–70. At the March 3rd hearing, Mr. Rosenau admitted on cross-examination that the letter he requested from Mr. Freeman might give Goodrich the ability to exercise its cancellation option under Amendment D of the Vinylplex contract. Furthermore, Mr. Rosenau testified that he knew Goodrich would discuss terminating the Vinylplex contract upon receipt of Mr. Freeman's letter.

13. Mr. DeWolf admitted on cross-examination that he wanted to immediately terminate the Vinylplex contract or modify it to Goodrich's advantage, and that neither of these goals would be accomplished by terminating under Amendment A. Both Mr. Rosenau and Mr. DeWolf found the Vinylplex contract to be unfavorable to Goodrich because of the restrictive Most Favored Nations pricing, the liberal credit terms, and the restrictive termination provisions. Consequently, when Goodrich received Mr. Freeman's April 9th letter, Mr. Rosenau, Mr. DeWolf, and a Goodrich attorney discussed whether the letter could be used to invoke the cancellation option under Amendment D. On the advice of counsel and on the basis of their interpretation of both Amendment D and the Freeman letter, Messrs. Rosenau and DeWolf decided that Mr. Freeman's April 9th letter provided Goodrich the opportunity to exercise its cancellation option.

14. Accordingly, on April 15, 1987, one day after receiving the April 9th letter, Goodrich informed Mr. Freeman by telephone and a confirmation letter that Goodrich was immediately cancelling the Vinylplex contract, pursuant to Amendment D. Nevertheless, Goodrich expressed a desire to continue supplying Vinylplex with PVC compound if the parties could agree to new contract terms.

15. On May 5, 1987, Mr. Freeman met with Goodrich representatives Robert Rosenau, Frank DeWolf, and Ray Walker in Pittsburg, Kansas. During this meeting, Mr. Freeman informed these Goodrich representatives that the attempted cancellation under Amendment D was ineffective and contrary to the terms of the contract. Additionally, Mr. Freeman maintained that his April 9th letter was no more than a customary part of the monthly price negotiations. Also during this meeting, Mr. DeWolf reiterated that Goodrich wanted to continue supplying Vinylplex, but that Goodrich was only willing to work on a month-to-month basis, without a commitment as to quantity or duration of supply. Since April 15, 1987, Vinylplex has continued to protest the effectiveness of Goodrich's purported cancellation, and Goodrich has continued to maintain that its cancellation pursuant to Amendment D was valid. To date, Goodrich has not attempted to terminate the contract under Amendment A.

16. Notwithstanding this impasse, Vinylplex continued to rely on Goodrich for its PVC compound supply. Between April 15, 1987, and the late summer of 1987, Vinylplex did not pursue long-term contracts with other suppliers. Additionally, in May 1987 Vinylplex began operating a sixth extrusion line, in June 1987 began operating on a seven-day work week, and throughout 1987 shifted its customer base from end users to distributors, which had the effect of increasing sales volume, while also decreasing average sales price. These changes increased Vinylplex's material requirements.

17. Because Vinylplex was uncomfortable dealing with Goodrich on a month-to-month basis, Goodrich offered Vinylplex a new supply contract in July 1987. According to a document prepared by Mr. Rosenau entitled "1988 Customer Mix Comments," the purpose of Goodrich's proposed contract was "to minimize potential legal hazards from cancelling the original agreement." *See* Exhibit 32. This proposed contract provided that Goodrich would supply Vinylplex with 1.7 to 2 million pounds of PVC compound from August 1, 1987, through December 1988, according to its standard terms and conditions. In other

words, this proposed contract did not contain the favorable provisions Vinylplex succeeded in negotiating into the February 15, 1982, contract. Nevertheless, Mr. Freeman agreed to review the proposed contract, although he reiterated Vinylplex's belief that the February 15, 1982, contract was still in force.

18. On August 21, 1987, Mr. Freeman responded to Goodrich's July contract proposal in a letter to Mr. DeWolf. In essence, Mr. Freeman's response was a counterproposal, accepting certain terms and requesting modification of other terms.

19. Goodrich determined that Vinylplex's counterproposal was unacceptable. In a letter dated October 9, 1987, and revised October 16th, Frank DeWolf withdrew the proposed contract and submitted another proposal, which provided that Goodrich would supply Vinylplex with declining amounts of PVC compound through March 1988, as follows:

| November | 1987 | 10 railcars |
| December | 1987 | 8 railcars |
| January | 1988 | 6 railcars |
| February | 1988 | 4 railcars |
| March | 1988 | 2 railcars |

This proposal also provided the following payment terms: net 45 days for November through January, net 30 days thereafter. The letter concluded:

> There is no need for you to immediately provide a written response, unless you should disagree with this proposal. Otherwise, your placing of November orders with us will be deemed to be your acceptance of these terms and conditions.

*See* Exhibit 15. This letter, which was authored by Mr. Rosenau, but sent out under Mr. DeWolf's signature, put Vinylplex in a "take it or leave it" position: because of the very tight resin market and Vinylplex's failure to secure an alternative source of supply, Vinylplex could either purchase the PVC compound from Goodrich under the October terms, or be without PVC compound. On October 30, 1987, Vinylplex placed an order for ten railcars for November delivery.

20. At Mr. Freeman's request, a meeting was scheduled in Cleveland on November 5th to discuss the supply situation.

During the meeting, Mr. Freeman once again reiterated Vinylplex's position that the February 15, 1982, contract was still in effect. Furthermore, he informed Goodrich that the October proposal for declining supply was unacceptable. Mr. Freeman asked Goodrich to reconsider its position and made two alternative proposals: (1) that Goodrich resubmit its July 1987 contract proposal, or (2) that Goodrich supply twelve railcars of PVC compound per month through March 1988. *See* Exhibit 16. Goodrich did not agree to either of these proposals.

21. On November 6, 1987, one day after the Cleveland meeting, Mr. Rosenau wrote Mr. Freeman confirming Vinylplex's November order of ten railcars and stating that Goodrich understood this order to be Vinylplex's acceptance of the October offer. Because he had previously informed Goodrich that the October offer was unacceptable, Mr. Freeman did not respond to Mr. Rosenau's letter.

22. Since Vinylplex could not find an alternate supplier who could provide its entire monthly requirements of PVC compound, Vinylplex purchased the compound in the declining quantities Goodrich offered. Vinylplex paid for the November and December shipments on 45–day terms, in accordance with the terms set forth in the October offer.

23. A severe resin shortage has existed since mid–1987. Subsequent to the November 5th meeting, Mr. Freeman contacted all the major domestic resin producers capable of providing Vinylplex's PVC compound requirements. With the exception of Shintech, all producers contacted refused to supply Vinylplex, except on a spot market basis, due to the shortage.

24. Pursuant to an agreement dated April 1, 1987, Vinylplex received four railcars of resin per month from Shintech. In a second agreement dated November 19, 1987, Vinylplex contracted with Shintech for the delivery of a total of eight railcars of resin per month from December 1, 1987, through December 1, 1988. This contract was amended in January 1988 to provide

that once Shintech's plant expansion is completed sometime in the future, Shintech will provide Vinylplex a total of eleven railcars of resin per month. Vinylplex considers the contract with Shintech to be less favorable than its February 15, 1982, contract with Goodrich because it has no Most Favored Nations clause, it has a net-30-days-payment clause, and it has no post-termination supply provision.

25. The Shintech supply of eight railcars per month plus the Goodrich supply as set forth in Mr. DeWolf's October 9th letter will provide Vinylplex its PVC compound requirements through the end of March 1988. After March, however, Vinylplex will have no PVC compound in inventory, and its PVC compound supply will be reduced to the eight railcars Shintech has agreed to supply, which is approximately 50% of the PVC compound needed to operate the Vinylplex plant at full capacity. Consequently, this supply reduction will make it necessary for Vinylplex to terminate 10–12 employees and return to a five-day-per-week production schedule on April 1, 1988.

26. The PVC compound supply reduction will thus result in Vinylplex operating at less than full capacity, which in turn will produce the following problems:

a. losses of $500,000 to $700,000 for the fiscal year ending March 1989;

b. loss of customers due to an inability to meet the currently high demand; and

c. loss of reputation as a reliable PVC pipe manufacturer.

Additionally, if Vinylplex is forced to operate at a loss during what would otherwise be a profitable, high demand market cycle, Vinylplex's survival as a business will be jeopardized. Indeed, Mr. William Freeman, Zurn Industries' chief financial officer, testified that Zurn would not allow Vinylplex to continue operating if it produced losses during the PVC pipe industry's current profit cycle. Although closing the Vinylplex plant would not substantially harm Zurn Constructors or its parent, Zurn Industries, it would result in the destruction of Vinylplex as a business entity and the loss of 53 jobs and a major employer in Pittsburg, Kansas.

27. Since 1985, Goodrich has pursued a policy of shifting its resin sales to higher profit specialty markets. After March 1988, Goodrich's resin supply is 100% committed to customers other than Vinylplex. Mr. DeWolf testified that Goodrich cannot meet all its customers' requirements and therefore must allocate the limited resin supply through controlled distribution contracts. Thus, requiring Goodrich to supply Vinylplex after March would:

a. interfere with Goodrich's sales to its customers;

b. require Goodrich to alter a three-year-old corporate strategy;

c. erode Goodrich's customer base;

d. detrimentally effect customers who rely on Goodrich for 100% of their specialty resin needs, which resins are unique and produced only by Goodrich; and

e. require Goodrich to shift its resin production from specialty resins to pipe resins.

28. As a part of its corporate strategy to deemphasize pipe resin sales and increase resin sales in higher profit specialty markets, Goodrich developed a plan in late 1986 to make a controlled exit from the pipe resin market. According to Mr. De-Wolf's testimony, Goodrich wanted to maintain its production facilities at 100% operating capacity during the planned, controlled exit. Consequently, to avoid reducing production capacity during the transition, Goodrich could not sever supplies to its pipe resin customers until it had specialty customers whose resin demands would replace the pipe resin demands. Mr. De-Wolf testified that this strategy to diversify its resin sales was publicized. Nevertheless, despite his inquiries concerning Goodrich's rumored plans to exit the pipe resin market, Mr. Freeman testified that Goodrich repeatedly denied the existence of such plans until October 23, 1987, when Mr. DeWolf admitted in a telephone conversation with Mr. Freeman that Goodrich was, in fact, making a controlled exit from the pipe resin market. Although not all of

the strategies for withdrawal were implemented, Mr. DeWolf testified that Goodrich has, in fact, achieved its goal of making a controlled exit from the pipe resin market and shifting its resin sales to specialty markets with higher rates of return.

29. According to Mr. Freeman's testimony, had Goodrich informed him in late 1986 or early 1987 of its plans for a controlled exit from the pipe resin market, Vinylplex would have immediately begun searching for an alternative long-term resin supplier.

### Conclusions of Law

The court has subject matter jurisdiction over this action under 28 U.S.C. § 1332. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (c).

■ Plaintiff Vinylplex seeks relief in the form of a preliminary injunction restraining defendant Goodrich from discontinuing its PVC compound supply at the end of March 1988 and requiring defendant to supply plaintiff with PVC compound pursuant to the February 15, 1982, contract, including the Most Favored Nations pricing provision. The Tenth Circuit recently reiterated the standards governing a motion for preliminary injunction in *Tri–State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351 (10th Cir.1986). In order to obtain a preliminary injunction, the moving party must establish the following four factors:

> (1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits.

*Id.* at 355; *see also Otero Savings & Loan Ass'n v. Federal Reserve Bank of Kansas City, Mo.*, 665 F.2d 275, 278 (10th Cir.1981); *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980). When the first three requirements for a preliminary injunction are satisfied, the moving party's burden of proof on the fourth requirement is lessened. "[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir.1964) (citing *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir.1953)).

■ The purpose of a preliminary injunction is "to preserve the status quo pending the outcome of the case." *Tri–State*, 805 F.2d at 355; *Continental Oil*, 338 F.2d at 781. In the instant case, however, plaintiff admittedly asks the court not to preserve the status quo but to grant it affirmative relief by mandating that the defendant supply it with 14–16 railcars of PVC compound per month; *i.e.*, that the defendant specifically perform the February 15, 1982, contract.[6] Because mandatory preliminary injunctions disturb rather than preserve the status quo, "[i]t is fundamental that mandatory injunctive relief should be granted only under compelling circumstances inasmuch as it is a harsh remedial remedy process not favored by the courts." *Citizens Concerned for Separation of Church & State v. City & County of Denver*, 628 F.2d 1289, 1299 (10th Cir.1980), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981); *accord Committee of Central American Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir.1986); *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir.1978); *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir.1980); *see also* 42 Am.Jur.2d *Injunctions* §§ 16, 17, 20 (1969). Consequently,

---

**6.** Ordering specific performance of a contract or prohibiting a defendant's continuing breach of a contract makes an injunction a mandatory one. *See, e.g., American Hospital Supply Corp. v. Hospital Products Ltd.*, 780 F.2d 589, 594 (7th Cir.1986); *McLouth Steel Corp. v. Jewell Coal &* *Coke Co.*, 570 F.2d 594, 608–09 (6th Cir.1978); *Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33, 34 (8th Cir.1975); *Oskey Gasoline & Oil Co., Inc. v. OKC Refining, Inc.*, 364 F.Supp. 1137, 1145 (D.Minn.1973).

mandatory injunctions are not granted in doubtful cases in which the facts and law do not clearly favor the moving party. *See, e.g., Anderson v. United States,* 612 F.2d 1112 (9th Cir.1979); *Martinez v. Mathews,* 544 F.2d 1233 (5th Cir.1976); *Clune v. Publishers' Ass'n of New York City,* 214 F.Supp. 520 (S.D.N.Y.), *aff'd per curiam,* 314 F.2d 343 (2d Cir.1963). Despite the stricter standard required for mandatory injunctive relief, the court concludes that plaintiff has established that the facts and the law clearly favor our granting its motion for a preliminary injunction.

### A. *Irreparable Harm*

■ Plaintiff claims it will be irreparably harmed in several ways if defendant is allowed to discontinue its monthly supply of PVC compound. First, plaintiff claims that because the Shintech supply contract provides only half of its PVC compound requirements it will not be able to meet customer demands, which are presently very high. Consequently, plaintiff will lose goodwill and will eventually lose its customers to other PVC pipe manufacturers able to meet customer demands. Second, the reduction of compound supply will necessitate plaintiff's laying off 10–12 employees and curtailing operations from seven days per week to five days per week on April 1, 1988. Third, plaintiff will not be able to operate profitably at less than full capacity, and thus will eventually be forced to cease its manufacturing operations altogether. Numerous cases support the conclusion that loss of customers, loss of goodwill, and threats to a business' viability can constitute irreparable harm. *See Tri–State Generation,* 805 F.2d 351, 356 (10th Cir. 1986); *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124, 125–26 (2d Cir.1984); *Otero Savings & Loan Ass'n v. Federal Reserve Bank,* 665 F.2d 275, 278 (10th Cir.1981); *Federal Leasing, Inc. v. Underwriters at Lloyd's,* 650 F.2d 495, 500 (4th Cir.1981); *Valdez v. Applegate,* 616 F.2d 570, 572 (10th Cir. 1980); *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 588 F.2d 24, 28–29 (2d Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979); *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970); *Associated Producers Co. v. City of Independence,* 648 F.Supp. 1255, 1258 (W.D.Mo.1986); *Stanley–Fizer Associates, Inc. v. Sport–Billy Productions Rolf Deyhle,* 608 F.Supp. 1033, 1035 (S.D.N.Y.1985); *Great Salt Lake Minerals & Chemicals Corp. v. Marsh,* 596 F.Supp. 548, 557 (D.Utah 1984).

■ On the other hand, defendant argues that plaintiff's alleged harms are not irreparable because: (1) Zurn Constructors, of which Vinylplex is a division, will not suffer financially even if Vinylplex ceases to exist; (2) the severity of harm is speculative; and (3) an adequate remedy at law exists for Vinylplex's projected losses. Although the evidence presented at the hearing indicated that the loss of the Vinylplex division would not cause Zurn Constructors substantial financial harm, the court concludes that this evidence alone does not negate plaintiff's arguments of irreparable harm. The question of whether plaintiff stands to suffer irreparable harm is not answered by defendant's contention that plaintiff will not suffer financially. The irreparable harm standard is not necessarily met by a given *quantity* of harm; rather, it is met by showing that the *quality* of the harm is irremediable by a monetary damage award. *See Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1981); *Interox America v. PPG Industries, Inc.,* 736 F.2d 194, 202 (5th Cir.1984). The potential loss of an entire division of a company and a major employer in a small town is not likely to be compensable by any amount of money, and therefore qualifies as irreparable harm.

Defendant also argues that the severity of the harm is too speculative to warrant preliminary injunction relief. In support of this argument, defendant states that plaintiff has previously operated at a loss without threats to its existence, and that the duration of the PVC resin shortage is unknown. The evidence presented at the hearing removed the spectre of speculation from the court's mind. The irrefuted evi-

dence indicated that: (1) Vinylplex operated at a loss during periods of low demand in the PVC pipe industry; (2) currently, the PVC pipe industry is experiencing a high demand cycle; and (3) Zurn Constructors will shut down Vinylplex if it cannot operate at a profit during this high demand cycle and reverse its previous years' losses. Moreover, despite defendant's arguments to the contrary, the evidence indicated that the PVC resin shortage will last at least into 1990. The Shintech supply is not guaranteed beyond December 1988 and spot market purchases, if available, will not be able to supply Vinylplex's remaining PVC compound needs of six to eight railcars per month for 1988. Thus, if Vinylplex's PVC compound supply remains at 50% capacity because of defendant's actions, its continued existence is definitely at risk.

Finally, defendant contends that since plaintiff can estimate its losses at 50% operating capacity, it has an adequate remedy at law. If plaintiff were threatened with only the loss of profits, defendant's argument would be a compelling one. However, plaintiff's very business existence is threatened, not just its ability to maximize profits. Under these circumstances, money damages would not be an adequate remedy if they came too late to save Vinylplex from extinction. *See Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975); *Roso–Lino Beverage,* 749 F.2d at 125–26; *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386 (7th Cir.1984); *Federal Leasing,* 650 F.2d at 500; *Bateman v. Ford Motor Co.,* 302 F.2d 63, 66 (3d Cir.1962). For all of the above reasons, the court concludes that plaintiff will suffer irreparable harm without the requested injunctive relief.

### B. *Balance of Harms*

The balance of harms tips decidedly in plaintiff's favor. As previously discussed, plaintiff will lose customers, goodwill, will have to curtail operations and lay off employees as soon as April 1, 1988, and will have to shut down the Vinylplex plant if forced to operate at 50% capacity. Defendant also stands to suffer some harms if forced to supply plaintiff with PVC compound pursuant to the parties' February 15, 1982, agreement. Because defendant's PVC resin output is completely committed to other companies as of April 1st, defendant will lose customers, goodwill, profits, and will have to alter its corporate strategy of selling its PVC resin to higher-profit specialty markets. Although the loss of customers and goodwill tips the balance in neither parties' favor, plaintiff's potential loss of its entire business decidedly outweighs defendant's potential lost profits and its being forced to alter its corporate strategy. Presumably, corporate strategies for products in a volatile market are, by necessity, in a constant state of flux, and defendant's potential lost profits are compensable with money damages, should a trial on the merits be decided in defendant's favor. Consequently, plaintiff's irreparable harms, balanced against defendant's reparable harms, warrant the granting of injunctive relief.

### C. *Public Interest*

Plaintiff contends that the court's granting injunctive relief will serve the public interest in two ways. First, the preliminary injunction will prevent the Vinylplex manufacturing plant's closing, thus saving 53 jobs and a major employer in Pittsburg, Kansas. Second, the injunction will encourage continued price competition in the PVC pipe industry, competition which is needed in a period of short supply and high demand.

■ Although defendant did not refute these contentions, defendant raised the concern that enforcing this injunction will require a great deal of court supervision, which would not serve the public interest. Because defendant does not wish to deal with plaintiff pursuant to the 1982 contract, because plaintiff has accused defendant of fraud, and because the contract requires monthly price negotiations, defendant contends that continual court supervision will be necessary. The need for court supervision is one of the ingredients in the court's discretionary formula for determin-

ing whether to issue a preliminary injunction, *see, e.g., Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33, 39 (8th Cir.1975), but in this case does not provide a sufficient reason for denying plaintiff's requested relief. The February 15, 1982, contract adequately specifies how the parties are to deal with one another in price negotiations, which should alleviate the necessity for the court's involvement. Moreover, should the defendant fail to abide by the terms of the injunction, such conduct can be dealt with in a variety of ways, none of which would require continual court supervision.

Arguably, the public interest in having scarce resources sold at their highest market price would be served by the court's denying plaintiff's request for injunctive relief. Nevertheless, the court has determined that the greater public interest will be served by granting this injunction; *i.e.*, 53 jobs will be saved in Pittsburg, Kansas, and the PVC pipe industry will retain an active competitor.

### D. *Likelihood of Success on the Merits*

■ If plaintiff were seeking a prohibitory, rather than a mandatory, injunction, its satisfaction of the first three preliminary injunction requirements would reduce the burden of proof on this final requirement. Because plaintiff seeks a mandatory injunction via specific performance of a contract, however, its burden is not lessened: plaintiff must show that the facts and law clearly favor its likelihood of success on the merits. Despite the fact that plaintiff's fraudulent misrepresentation claim raises considerable suspicions about the defendant's conduct, the court believes the evidence presented does not so clearly favor plaintiff as to warrant a mandatory injunction. Accordingly, we did not use the fraud claim as a basis for this opinion. Instead, the court will focus its discussion on plaintiff's breach of contract claim.

Before discussing the merits of plaintiff's claim, the court notes the following rules of contract interpretation which will be useful to our discussion. First, construction of a contract is necessary only when its terms are ambiguous, *i.e.*, when

its terms can be interpreted to have two or more possible meanings. *See Havens v. Safeway Stores*, 235 Kan. 226, 231, 678 P.2d 625, 630 (1984); *Fast v. Kahan*, 206 Kan. 682, 684, 481 P.2d 958, 961 (1971). Second, the contracting parties' intent and purpose are important in interpreting a contract. *See New Hampshire Insurance Co. v. Fox Midwest Theatres, Inc.*, 203 Kan. 720, 726, 457 P.2d 133, 138 (1969). Finally, parties' subsequent conduct "may aid interpretation of controversial provisions." *Heyen v. Hartnett*, 235 Kan. 117, 123, 679 P.2d 1152, 1157 (1984).

Defendant contends that it properly cancelled the February 15, 1982, contract by invoking Amendment D after receiving plaintiff's letter dated April 9, 1987. Amendment D provides:

> D. *Competitive Offer*
>
> If buyer receives a written offer from a major domestic producer not controlled by or controlling the buyer, to supply, in place of seller, *any of* all the goods remaining to be supplied hereunder which are of like quality, for a like use and deliverable in like quantities, at a delivered cost less than the then effective delivered cost hereunder, upon buyer's written notice stating all the terms and conditions including the quantity the buyer intends to purchase of the competitive offer, seller shall by notice within three (3) days of receipt of buyer's notice (a) meet the competitive offer and amend this contract accordingly, (b) choose not to meet and deduct from the seller's maximum obligation to supply the quantity that the buyer intends to purchase from the competitive source, or (c) cancel the contract. By definition, a major domestic producer is any domestic producer with published PVC resin capacity in excess of 2,000,000 pounds annually.

We find Amendment D to be unambiguous; therefore, the parties are bound by its strict terminology. *See Smerchek v. Hamilton*, 4 Kan.App.2d 346, 347, 606 P.2d 491, 493 (1980). According to its terms, defendant could invoke Amendment D only if the

following conditions were met: (1) plaintiff must receive a written supply offer from a major domestic producer; (2) the goods offered must be of like quality, for like use, deliverable in like quantities (in railroad cars), and lower in price; and (3) plaintiff must give defendant written notice of the offer, stating all its terms and conditions, including the quantity plaintiff intended to purchase.

Amendment D's first condition of a written offer was not met. The uncontroverted evidence was that the competing supplier made an oral offer to plaintiff over the telephone; no written offer was submitted, and plaintiff's April 9th letter did not identify the offer as a written one. *See supra,* p. 1176. Although the amendment does not state the purpose of requiring a written offer, the purpose is not difficult to uncover, given the provisions of the entire contract and the evidence presented regarding spot market purchases. The contract provides that defendant would supply 90% of plaintiff's requirements or 26,000,000 pounds annually, whichever was greater, and that defendant has the option of supplying more than this maximum quantity. Additionally, defendant has a right of first refusal to supply off-grade PVC compound for the 10% balance of plaintiff's requirements. The contract contains no provision regarding spot market purchases. According to the deposition testimony of Raymond T. Walker and evidence presented at the hearing, spot market purchases are made without contracts or commitments from the supplier.

With this information in mind, the court has determined that requiring a written offer as a condition to invoking Amendment D serves two purposes. First, requiring a written offer prevents spot market purchases from triggering Amendment D, thus allowing plaintiff to buy the 10% balance of its requirements of high grade resin (or more than the maximum) on the spot market without jeopardizing its long-term supply commitment from defendant. Sec-

ond, requiring a written offer protects defendant from "competing in the dark" with other suppliers and gives the defendant an opportunity for a "last look" before deciding which of Amendment D's three options would best serve its needs. These purposes mirror the dual purpose of the entire amendment: protecting the plaintiff from being charged unreasonable prices, while at the same time protecting defendant from losing the demand necessary to keep its resin facilities operating at 100% capacity and maximum efficiency. Accordingly, Amendment D's first condition of a written offer protects both parties' interests and cannot be circumvented, no matter how convenient such circumvention would be to the defendant.

The condition requiring plaintiff to give written notice of a competitive offer, stating *all* the terms and conditions, also was not met. The only "terms and conditions" mentioned in plaintiff's April 9th letter were price and quantity. The court concludes that these two terms were not the only ones contemplated by the word "all." Indeed, during times of short supply, it is logical to assume that an offer would contain a time limit on the offer, payment terms, delivery terms, and other such provisions. Moreover, since the oral offer was for PVC resin rather than PVC compound, the offer would need to contain terms regarding compounding costs in order for defendant to intelligently evaluate its options under Amendment D; *i.e.,* whether defendant could afford to meet the competitive offer.

In sum, two of Amendment D's three conditions were not met. Defendant's strong desire to cancel the contract without resort to Amendment A's restrictive termination provision (*see supra,* pp. 1174–75) clouded its reading of plaintiff's April 9th letter and led defendant to mistakenly conclude that the letter provided it with the opportunity to invoke Amendment D's cancellation clause.[7] Reading the April 9th

7. As defendant states in its brief, the motive for cancelling the contract is irrelevant to the issue of whether defendant breached the contract. Nevertheless, we find defendant's motive in re-

questing the April 9th letter from plaintiff to be highly relevant. Mr. Rosenau's testimony at the hearing and Mr. Walker's deposition testimony indicate that defendant requested the letter,

letter objectively, however, it focuses on one theme—market price —and is nothing more than plaintiff's attempt to convince defendant that its quoted price is out of line with the going market price, as evidenced by an oral offer for a spot market purchase. Consequently, defendant's purported cancellation of the contract under Amendment D was ineffective, and the February 15, 1982, contract is still in effect.

Despite the continuing validity of the 1982 contract, defendant argues that plaintiff's failure to mitigate and the October 1987 accord and satisfaction will prevent plaintiff from succeeding on the merits of its breach of contract claim. We agree with defendant's premise that plaintiff had a duty to mitigate, if reasonably possible. *See, e.g., Jack Richards Aircraft Sales, Inc. v. Vaughn,* 203 Kan. 967, 974, 457 P.2d 691, 696 (1969). We do not agree, however, that plaintiff's failure to mitigate thwarts its breach of contract claim. When defendant purported to cancel the contract in April 1987, it represented to plaintiff that it was still interested in and planning on supplying plaintiff with its PVC compound needs, but that it was not interested in continuing under the terms of the 1982 contract. These representations continued until October 1987, at which time defendant informed plaintiff of its planned transition from the pipe resin market to the specialty resin market. Indeed, defendant supplied plaintiff's total PVC compound needs through June 1987, and agreed· to supply 10–12 railcars in both July and August. In spite of plaintiff's belief that the 1982 contract had not been cancelled, plaintiff continued negotiating with defendant throughout the period April–July, and defendant offered plaintiff a new long-term contract in July. As a consequence of defendant's representations and conduct, plaintiff chose not to mitigate (*i.e.,* plaintiff did not attempt to contract with another company for a long-term supply of its entire PVC compound requirements), until defendant informed plaintiff in October that it would no longer be able to supply plaintiff's monthly needs. After defendant so informed plaintiff, plaintiff signed a contract with Shintech in November 1987 for eight railcars per month. Thus, plaintiff's decision not to mitigate until October 1987 was reasonable, based upon defendant's conduct and upon its representations that it would supply plaintiff's monthly PVC compound needs.

Interestingly, defendant benefited from plaintiff's "failure to mitigate:" by keeping plaintiff as a customer, defendant could assure a 100% production capacity during its transition from pipe resin customers to specialty resin customers because defendant, operating under the belief that the 1982 contract had been cancelled, had complete discretion as to the quantity of PVC compound it supplied plaintiff. Thus, until its specialty resin customers' demands increased, defendant had a reliable monthly outlet for 14–16 railcars of pipe resin. Under these circumstances, plaintiff reasonably mitigated when it needed to do so—when defendant informed plaintiff in October that it would discontinue supplying plaintiff's PVC compound requirements. Therefore, plaintiff's alleged ·"failure to mitigate" does not diminish its likelihood of success on the merits of its breach of contract claim.

Defendant also contends that plaintiff's breach of contract claim is unsupportable in light of an alleged accord and satisfaction. "An accord and satisfaction is an agreement between two parties under which one party accepts a stipulated performance by the other party in discharge of an unresolved obligation by the latter party." *Stahl Management Corp. v. Conceptions Unlimited,* 554 F.Supp. 890, 892 (S.D.N.Y.1983). Mutual assent is required, as it is with all contracts. *Flowers v. Diamond Shamrock Corp.,* 693 F.2d 1146, 1152 (5th Cir.1982). Defendant claims that

---

hoping it would give defendant the foundation necessary to invoke Amendment D's cancellation option. Given this expectation, it is not surprising that defendant perceived the letter as it did. Similarly, because Mr. Rosenau represented to plaintiff that the requested letter was for price negotiation purposes, it is not surprising that the letter's focus is market price rather than the terms and conditions of an alternate supply contract.

its October letter stating its terms for a diminishing supply of PVC compound from November 1987 to March 1988 constituted an offer. *See supra,* pp. 1177–78. The October offer specified plaintiff's manner of acceptance: placing its November order. Defendant claims that plaintiff's November order, and its subsequent orders, all of which were placed in accordance with the October offer, constitutes a valid acceptance which binds plaintiff to this accord and satisfaction, in lieu of the 1982 contract. For the reasons discussed below, the court concludes the alleged accord and satisfaction fails for lack of mutual assent.

Mr. Jack Freeman testified that he objected to the terms of the October offer in an October 23rd telephone conversation with Mr. DeWolf and in the November 5th meeting. Although defendant disputed this testimony, we find Mr. Freeman's testimony to be credible for two reasons. First, plaintiff never ceased asserting the continuing validity of the 1982 contract;[8] thus, plaintiff's objection to any attempts to supplant the 1982 contract with the October interim supply proposal is implicit. Second, Mr. Freeman's October 31st written summary of events presented to those attending the November 5th meeting requests defendant to reconsider its October offer, thus indicating plaintiff's objection to the offer. Plaintiff's objection to the October offer evidences a lack of mutual assent, which precludes an effective accord and satisfaction.

Moreover, defendant's accord and satisfaction argument is severely undermined by the circumstances surrounding the October offer. Resin was in short supply, and demand was high. Additionally, defendant's conduct and representations kept plaintiff dependent on defendant's supply of its PVC compound requirements. By October, when plaintiff first learned of defendant's plan to discontinue its supply, plaintiff was in the precarious position of having no alternative but to place its orders in accordance with defendant's terms. Considering these circumstances, the court concludes that the plaintiff is not bound by the alleged accord and satisfaction.

As defendant stated in its brief, the plaintiff must prove three things in order to prevail on its breach of contract claim: (1) that defendant's April cancellation was ineffective; (2) that plaintiff reasonably mitigated; and (3) that plaintiff is not bound by the October accord and satisfaction. The court finds that plaintiff can pass these three hurdles and will likely succeed on the merits of its breach of contract claim. Furthermore, we find that the law and facts so clearly favor plaintiff as to warrant mandatory injunctive relief.

**E. *Appropriate Injunctive Relief***

■■■ The court has no difficulty granting specific performance of the 1982 requirements contract, especially considering the shortage of PVC resin supplies, which shortage will likely continue until 1990. As the Kansas comments to the Uniform Commercial Code's specific performance provision, K.S.A. 84–2–716, explain:

Subsection (1) expands and liberalizes the buyer's remedy of specific performance. Cases involving traditionally "unique" goods are still covered, but the Code extends the remedy into commercial settings as well. The Code's test of uniqueness is expressed in terms of the total situation, including the commercial feasibility of replacement. Thus, output and requirements contracts which involve a particular or peculiarly available source or market are typical cases where

---

**8.** Defendant argues that Mr. Freeman's written summary of events, presented to those attending the November 5th meeting, evidences plaintiff's acquiescence in defendant's purported April cancellation. First, Mr. Freeman's summary stated that defendant cancelled the contract in April. Second, the summary lists two alternative supply contracts. The court has determined that this summary does not evidence plaintiff's acceptance of defendant's April cancellation. The statement referring to the defendant's cancellation is merely informing the reader of events which took place and makes no representations regarding the cancellation's validity or invalidity. Likewise, the alternative contract proposals do not evidence anything but plaintiff's continuing attempts to obtain a supply commitment from defendant, since defendant refused to meet its obligations under the 1982 contract.

specific performance should be appropriate.

Given the statute, the above-quoted comments, the case law supporting specific performance in similar circumstances,[9] and plaintiff's inadequate remedy at law, the court will fashion this preliminary injunction in specific performance terms. However, due to the resin shortage and plaintiff's outstanding contract with Shintech, we will take the liberty of modifying the 1982 contract's quantity terms for the remainder of 1988.

IT IS THEREFORE ORDERED that defendant supply a minimum of six (6) and a maximum of eight (8) standard railcars of PVC compound per month, dependent upon plaintiff's needs, from April 1988 through December 1988. Except for this modification to the quantity terms for 1988, defendant is ordered to specifically perform under the 1982 contract. Assuming that defendant will terminate the 1982 contract pursuant to Amendment A, defendant is further ordered to supply plaintiff pursuant to the 1982 contract, without quantity modifications, from January 1989 through November 1989.

IT IS FURTHER ORDERED that defendant is to specifically comply with Amendment B, paragraph 4 of the 1982 contract, known as the Most Favored Nations provision. To facilitate defendant's compliance with this provision, the parties are given thirty (30) days from the date of this order to agree on an interim interpretation of whether the provision means (1) that the plaintiff must purchase like quantities to receive a lower price or (2) that the plaintiff is allowed to purchase like quantities (but not exceeding its monthly requirements) at the lower price.

IT IS FURTHER ORDERED that both parties are to specifically perform under Amendment B's pricing provisions and that both parties negotiate prices in good faith.

IT IS FURTHER ORDERED that the parties have until 5:00 p.m. Wednesday, March 30, 1988, to negotiate the amount of the bond and inform the court of your decision. If the parties cannot agree to the amount, the court will set an appropriate bond. In the interim, plaintiff is ordered to post a temporary bond of $100,000 with the clerk of the court in order to make this preliminary injunction effective.