SEPTEMBER 1, 1988

No. A–172.  SPALLONE v. UNITED STATES ET AL.;
No. A–173.  LONGO ET AL. v. UNITED STATES ET AL.;
No. A–174.  CHEMA v. UNITED STATES ET AL.; and
No. A–175.  CITY OF YONKERS v. UNITED STATES ET AL.
C. A. 2d Cir.  Applications for stay of Henry G. Spallone, Nicholas Longo, Edward Fagan, and Peter Chema, presented to JUSTICE MARSHALL, and by him referred to the Court, granted pending the timely filing and disposition by this Court of petitions for writs of certiorari.  Application for stay of city of Yonkers, presented to JUSTICE MARSHALL, and by him referred to the Court, denied.

JUSTICE MARSHALL, joined by JUSTICE BRENNAN, concurring in the denial of stay in No. A–175, and dissenting from the grant of stay in Nos. A–172, A–173, and A–174.

On August 26, 1988, the Court of Appeals for the Second Circuit upheld both the District Court's determination that the city of Yonkers and four members of its city council were in contempt of court and its imposition of sanctions for their failure to abide by a consent decree committing the city to implement a housing desegregation plan.  856 F. 2d 444.  The Court of Appeals stayed issuance of its mandate until September 2, to permit application for a stay of the contempt sanctions pending filing and consideration of petitions for writs of certiorari.  The city of Yonkers and the four councilmembers have sought such a stay.  Today the Court denies a stay as to the city but grants it as to the four councilmembers.  I believe that the Court should deny the stay as to the councilmembers as well.

I

In 1980, the United States filed suit against the city of Yonkers, claiming it had intentionally perpetuated and aggravated residential racial segregation in violation of the Constitution and Title

VIII of the Civil Rights Act of 1968, 82 Stat. 81, 42 U. S. C. §§ 3601–3619, and had intentionally segregated its schools in violation of the Constitution. The National Association for the Advancement of Colored People (NAACP) was accorded plaintiff-intervenor status. In 1985, the District Court held the city liable for intentional housing and school segregation, *United States* v. *Yonkers Board of Education,* 624 F. Supp. 1276 (SDNY 1985), finding, *inter alia,* that the city had deliberately concentrated virtually all of its public and subsidized housing in southwest Yonkers in order to maintain residential segregation. The District Court issued a Housing Remedy Order which directed the city to establish a fair housing policy, to construct 200 units of public housing, and to plan additional units of subsidized housing. The Court of Appeals for the Second Circuit affirmed both the liability and remedy rulings, *United States* v. *Yonkers Board of Education,* 837 F. 2d 1181 (1987), and the Court denied the city's petition for a writ of certiorari. 486 U. S. 1055 (1988).

On November 15, 1986, the city informed the District Court that it would not comply with the Housing Remedy Order. The United States and the NAACP moved for an adjudication of civil contempt and the imposition of coercive sanctions, but the District Court instead sought voluntary compliance with its earlier order. After negotiations, the city council—the city's sole governing authority—agreed to appoint an outside housing adviser to identify sites for the 200 units of public housing and to draft a long-term plan for subsidized housing. Over a year passed. On January 28, 1988, the parties entered into a consent decree, approved by the District Court, which set a new timetable for the construction of the 200 public housing units. The city pledged that it would not seek further review of the Housing Remedy Order or any subsequently entered decree relating to these 200 units. In addition, the city agreed that the construction of 800 units of subsidized housing was an appropriate remedy and pledged to make good-faith efforts to build the additional 600 units within the next three years. Section 17 of the consent decree obligated the city "to adopt . . . legislation" necessary to meet the goal of 800 units, including tax abatements, zoning changes, and, within 90 days, a package of incentives for local development. Section 18 provided for further negotiations and the submission of a draft of a second consent decree setting forth long-range plans for subsidized hous-

ing by February 15, 1988. The council approved the consent decree by a vote of 5 to 2.

Within two months, the city demonstrated its unwillingness to comply with the consent decree by moving unsuccessfully to delete the provision in which it promised not to seek further review of its obligation to build the 200 units, and by offering to return approximately $30 million in federal funds in the event this Court set aside the public housing provisions of the Housing Remedy Order. On April 12, 1988, the city announced that it was "not interested" in completing negotiations on the long-term plan for subsidized housing as required by § 18 of the consent decree. Following a hearing on June 13, the District Court entered a Long Term Plan Order outlining the legislation that the city had committed itself to adopt in § 17 of the consent decree. The order was based on a draft prepared by the city's lawyers during earlier negotiations and accommodated most of the city's objections.

The next day, June 14, 1988, the council adopted a resolution declaring a moratorium on all public housing construction in Yonkers. A week later, on June 21, the city announced that it had retained a consulting firm to draft housing legislation, and that the next council meeting was tentatively scheduled for August. The District Court, expressing concern about delay, asked the council to pass a resolution adopting the provisions of the Long Term Plan Order. On June 28, the council voted down a resolution indicating its commitment to implementing the Housing Remedy Order, the consent decree, and the Long Term Plan Order. The following day, the District Court directed the plaintiffs to submit an order requiring the city to take "specific implementing action" under a prescribed timetable on penalty of a contempt adjudication and imposition of fines. At a hearing held to consider the proposed order, the city stated that it would not voluntarily comply with the Long Term Plan Order and urged the court to enter an order adopting the necessary legislation. The city also objected to the creation of an Affordable Housing Commission to exercise the council's responsibilities for implementing the District Court's orders and the consent decree. The city argued that such a commission would impermissibly interfere with the council's "core legislative as well as executive functions."

On July 26, 1988, the District Court ordered the city to enact by August 1 "the legislative package relating to the long-term plan as described in Section 17 of the [consent decree] and the Long Term

Plan Order." This "legislative package" was set forth in a detailed Affordable Housing Ordinance drafted by the city's consultants. The July 26 order warned that if the legislation were not adopted by August 1, the city and the councilmembers would face contempt adjudication and the following fines: on the city, a fine starting at $100 on August 1 and doubling every day until the legislation was passed, so that the cumulative total of the fines would exceed $10,000 by day 7, $1 million by day 14, $200 million by day 21, and $26 billion by day 28; on the councilmembers, a fine of $500 per day on each member who voted against the legislative package, with the additional threat of incarceration on August 10 if the package were not adopted by the council by that time. To accommodate the city's expressed concern that it could not adopt legislation by August 1 without running afoul of state notice and hearing requirements, the District Court specified that its July 26 order would be "satisfied if the City Council, on or before August 1st, adopts a resolution committing itself to enact the Affordable Housing Ordinance within the minimum time prescribed for notice pursuant to state law." On August 1, the council rejected such a resolution by a vote of 4 to 3.

As contemplated by the July 26 order, the District Court held a hearing on August 2 to afford the city and councilmembers an opportunity to show cause why they should not be adjudicated in civil contempt. As for the city, the District Court "reject[ed] [its] contention that a dichotomy can be drawn between the city and the city council." Further, the District Court declined to adopt the Affordable Housing Ordinance for the city, as requested by the city, noting that the city should directly meet its responsibilities under the Constitution and the consent decree. As for the four councilmembers who had voted against the resolution of intent to adopt the Affordable Housing Ordinance, the District Court rejected their request for a continuance, observing that they had been on notice since July 26 of the prospect of contempt and the need for counsel, and that they had rejected the court's offer of an immediate evidentiary hearing. The District Court agreed nonetheless that it would permit argument at a later date on any theory or circumstance not then available to counsel. The District Court held the city and the councilmembers in contempt and imposed the sanctions set forth in the July 26 order.

On August 9, the Court of Appeals stayed the District Court's contempt sanctions against the city and the four councilmembers

pending appeal. On August 26, the Court of Appeals, in a unanimous opinion by Judge Newman, affirmed the District Court's contempt orders and the imposition of coercive monetary sanctions, with one modification in the city's sanctions. 856 F. 2d 444. First addressing the claims of the councilmembers, the Court of Appeals found that the procedural due process requirements attendant to the contempt adjudications were, with one exception, fully observed. The July 26 order provided sufficient notice to councilmembers of the consequences of noncompliance. Each member appeared with counsel and had an opportunity to present evidence and legal argument. Although the Court of Appeals found that it would have been preferable to have accorded counsel a few days to prepare, it declined to remand the matter given the absence of factual disputes and its decision on the merits. The Court of Appeals also rejected the councilmembers' First Amendment argument, stating that the public interest in obtaining compliance with federal-court judgments that remedy constitutional violations justifies whatever burden there may have been on the councilmembers' free expression rights.

As for the argument that the councilmembers were entitled to some form of legislative immunity, the Court of Appeals noted that, even if such immunity extends to individuals performing legislative functions at the purely local level, it would not bar district court orders requiring compliance with decrees redressing constitutional violations. The Court of Appeals stressed, however, that it was not necessary to answer the broad question whether a district court could order local legislators to vote in favor of a particular ordinance to redress a constitutional violation, because the council had approved, and the city had signed, a consent decree requiring the enactment of legislation necessary to implement the District Court's earlier order. The Court of Appeals found that all councilmembers, including those who had voted against the consent decree, were obligated to enforce it, and that their failure to do so made appropriate contempt adjudications and the imposition of sanctions.

Along these same lines, the Court of Appeals also decided that the District Court did not abuse its discretion in directing the council to adopt the Affordable Housing Ordinance, and in imposing coercive contempt sanctions to compel compliance, given that the city had agreed in the consent decree to adopt necessary implementing legislation. As for the claim that the July 26 order

compelled the council to violate state notice and hearing requirements, the Court of Appeals stressed the supremacy of federal court orders in implementing remedies for constitutional violations. The Court of Appeals added that, in any event, the council could have satisfied the July 26 order by passing a resolution committing itself to enact the legislation in accordance with state-law procedures. As for the city's claims, the Court of Appeals rejected the defense of impossibility, noting that the city had not done everything it could under city law to obtain compliance with the orders of the District Court. In particular, the city had not tried to coerce councilmembers into compliance by applying to the Emergency Financial Control Board to take action with respect to the city's financial affairs, or by requesting the Governor of New York to remove the recalcitrant councilmembers for misconduct. In any event, the Court of Appeals concluded, "[f]or purposes of taking official governmental action, the City of Yonkers is the City Council and vice versa." 856 F. 2d, at 458. The Court of Appeals noted in this regard that the city has no separate executive authority in that its mayor merely serves on the council, and that the city manager serves at the pleasure of the council.

Finally, as to the amount of the coercive fines, the Court of Appeals found that the Excessive Fines Clause of the Eighth Amendment does not apply to civil contempt sanctions imposed to obtain compliance with court orders. Although the court noted that the Due Process Clause of the Fifth Amendment arguably provides a limit, it relied on an abuse-of-discretion standard to review the amount of the fines. The Court of Appeals held that the District Court acted within its discretion in imposing cumulative fines and in starting the fine schedule at $100 a day, but it modified the schedule so that the fine would be $1 million on day 15 and $1 million for every subsequent day of noncompliance. Given the city's annual budget of $337 million, the Court of Appeals found that a $1 million a day fine was within "reasonable limits." 856 F. 2d, at 460.

II

The city argues that the fines imposed by the District Court violate the Excessive Fines Clause of the Eighth Amendment and the Due Process Clause of the Fifth Amendment; that the Court of Appeals erred in affirming the contempt adjudication because the District Court did not adopt less restrictive alternatives; that the city had a valid impossibility defense; and that the order

violated state law. Councilmembers Spallone and Chema claim legislative immunity. Chema also argues that the contempt sanction violates the First Amendment and his procedural due process rights. Councilmembers Longo and Fagan claim generally that the sanction was an abuse of discretion and unconstitutional.

## A. *The City*

The city's first contention is that the Excessive Fines Clause of the Eighth Amendment is applicable to contempt sanctions and that the particular sanctions imposed here were constitutionally excessive. The city accurately observes in this regard that the Court has indicated that the applicability of this Clause to punitive damages in civil cases is "a question of some moment and difficulty." *Bankers Life & Casualty Co.* v. *Crenshaw*, 486 U. S. 71, 79 (1988). But, even if the Clause applies to punitive damages, the city offers no compelling reason why we should extend its reach to civil contempt sanctions. Indeed, it appears settled that the Cruel and Unusual Punishments Clause does not apply to civil contempt sanctions. See *Ingraham* v. *Wright*, 430 U. S. 651, 668 (1977). This is not surprising since the Cruel and Unusual Punishments Clause, like the Excessive Fines Clause, applies to punishments for past conduct, while civil contempt sanctions are designed to secure future compliance with judicial decrees. See *ibid.; Uphaus* v. *Wyman*, 360 U. S. 72, 81 (1959). In any event, even assuming that the size of monetary contempt sanctions is limited by the Excessive Fines Clause or even the Due Process Clause, I do not think that the fines against the city, as modified by the Court of Appeals, are unreasonable. The city of Yonkers has an annual budget of $337 million. At one point, it offered to forfeit $30 million in federal funds to avoid compliance with the consent decree. Under these circumstances, a fine schedule which imposes $1 million a day only after noncompliance for 15 consecutive days can hardly be deemed unreasonable.

The city's second contention is that the contempt adjudication itself was improper because the District Court should have adopted less restrictive alternatives such as direct enactment of the legislation or appointment of an Affordable Housing Commission, and because the city had a valid impossibility defense. Neither contention has merit. First, the District Court had no need to resort to its equitable authority, codified in Federal Rule of Civil Procedure 70, to deem the legislation enacted, as the city had committed

itself to adopting that legislation in a court-approved consent order. Surely it is both less disruptive and more effective to order compliance with that order than to usurp completely the council's legislative authority and enact the legislation directly. Second, having previously objected to the creation of an Affordable Housing Commission, the city cannot now claim that the District Court should have created such an entity. The city also contends the District Court erred by rejecting its impossibility defense. It claims that it does not have the ability to compel the councilmembers to enact the legislation or to remove recalcitrant members. The city's attempt to divorce itself from the actions of its councilmembers is disingenuous. As the city repeatedly points out in its application, "Yonkers is relatively unique in that most of the governmental power in the city is centralized in the legislative branch." For this reason, the city *is* the council. Indeed, because the council sets municipal policy, see *Pembaur* v. *Cincinnati*, 475 U. S. 469, 481 (1986), it is reasonable to attribute to the city the acts of its elected policymakers.

## B. *The Councilmembers*

The councilmembers' primary argument is that a federal court lacks authority to order an individual local legislator, as opposed to the body in which he serves, to enact specific legislation. In the councilmembers' view, a federal court, by entering such an order, runs roughshod over what they see as the local legislator's right to be absolutely free from such restraints. While this issue arguably is of substantial interest, this case is not a proper vehicle for addressing it. In the first place, the broad question raised by the councilmembers is not presented by these facts. As the Court of Appeals stressed below, this is not a case where a federal court enjoined local legislators to vote in favor of a particular bill in order to remedy a constitutional violation. Far from that, this case presents the much more narrow question whether a federal court may order local officials to abide by an explicit obligation— here, a promise to enact legislation—contained in a consent decree that the officials voted to adopt and that the District Court agreed to accept. In short, this case is about a District Court's ability to enforce its consent decrees. In no way did the Court of Appeals even hint that federal courts possess the broad powers over local legislators that the councilmembers claim that the Court of Appeals arrogated to itself and the District Court.

In any event, it is not at all clear that federal courts lack authority in all circumstances to enter orders affecting a local legislator's performance of his legislative duties. In *Milliken* v. *Bradley*, 433 U. S. 267 (1977), the Court held that a District Court could order local school authorities to implement certain programs designed to ameliorate the effects of prior segregation policies. As a practical matter, the import of the Court's decision was that the individual members of the local school authority were required to vote a certain way for specific remedial programs. This necessary effect of a remedial order is highlighted by the Court's earlier decision in *Griffin* v. *Prince Edward County School Board*, 377 U. S. 218 (1964). There, the Court noted that a District Court possessed authority to order county supervisors "to exercise the power that is theirs to levy taxes" in order to reopen public schools that had been closed in an attempt to avoid a prior desegregation order. *Id.*, at 233. As in this case, the individual local officials in *Griffin* openly flouted clear commands of a District Court.

Although cases like *Milliken* and *Griffin* may stand for the proposition that the district courts may enjoin local legislators to take certain affirmative steps in order to remedy constitutional violations, the Court has never squarely addressed the question whether these local legislators are entitled to some form of legislative immunity. In *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency*, 440 U. S. 391, 404, n. 26 (1979), the Court specifically left open the question whether local legislators are entitled to any immunity. (Earlier, in *Tenney* v. *Brandhove*, 341 U. S. 367, 376 (1951), state legislators were afforded absolute immunity for activities within "the sphere of legislative activity"; *Lake Country* extended such immunity to "regional legislators," 440 U. S., at 405.) Since *Lake Country* issued, seven Courts of Appeals have held that local legislators are entitled to absolute legislative immunity. None of these cases, however, involved situations where the District Court sought to compel certain behavior to redress constitutional violations, let alone situations where the District Court merely sought to enforce a consent decree. Instead, the cases typically involved private-party damages actions against individual members of local governing boards. It would seem sensible to allow the lower courts to be the first to resolve the question whether legislative immunity protects local officials against the imposition of contempt sanctions for noncompliance with a consent decree imposing legislative obligations.

Even assuming that this question warrants the Court's immediate attention, the instant case contains a factual peculiarity that makes it unsuitable for review. The city stresses its "extraordinary" system of governance, in which the council exercises both legislative *and* executive powers. This necessarily complicates any legislative immunity analysis, particularly if one believes that the council exercised its *executive* prerogatives by not complying with the consent decree, and by not abiding by the July 26, 1988, order. Before the Court takes up the issue of local legislative immunity, it should wait for a case in which the legislative body is exercising *only* legislative powers.

Finally, the First Amendment and procedural due process claims strike me as totally meritless for the reasons articulated in the Court of Appeals' opinion. In any event, they involve the application of settled law to a particular set of facts.

## III

In my view, the claims presented by the city and the four councilmembers do not merit review by the Court. .I therefore vote to deny the applications for stay.