Suzanne HALEY, Ruth V. Verbal, Barbara J. Scott, James H. Watson, Nadine Jones, Joy King, Robert Matthews, Deborah Allen, and A. Joshua Ehrlich, Plaintiffs,

v.

George E. PATAKI, as Governor of the State of New York and the State of New York, Defendants.

No. 95–CV–550.

United States District Court, N.D. New York.

May 3, 1995.

Zwerling, Schachter, Zwerling & Koppell, New York City (G. Oliver Koppell, of counsel), for plaintiffs.

Dennis C. Vacco, Atty. Gen. of the State of N.Y., Albany, NY (Kenneth J. Munnelly, Alan S. Kaufman, of counsel), for defendants.

## MEMORANDUM, DECISION & ORDER

McAVOY, Chief Judge.

## I. BACKGROUND

Plaintiffs are legislative employees of the State of New York ("State"). They have been employed to provide services either for the duration of each legislative session or on an annual basis. Each of these legislative employees is generally paid a bi-weekly salary pursuant to New York State Finance Law § 200. Plaintiffs have not been paid for work performed for the State since March 31, 1995 notwithstanding the fact that payment for work performed through April 5, 1995 was due on April 19, 1995.

Each plaintiff has supplied reasons why he or she has been specifically harmed by not being paid on a timely bi-weekly basis. Plaintiff Haley is a single mother of three teenage children who earns $10,000 annually. Plaintiff Verbal is a single mother earning $24,000 annually and is the sole support of two sons with asthma. Plaintiff Scott is the primary family wage earner at $19,000 per year. Plaintiff Watson is the father of two sons and earns $23,000. Plaintiff King provides full support for herself and her two children, one of whom requires special medical and day care. Plaintiff Jones earns $17,000 per year and supports herself. Plaintiff Matthews earns $28,000 annually and is scheduled to purchase a new house in the unspecified future. Plaintiff Allen earns $21,000 and is the sole support a totally disabled husband and minor child. Plaintiff Ehrlich is the sole source of support of a totally disabled ex-wife. All plaintiffs claim that they will not be able to feed, clothe and house themselves, and in many cases their families, if not paid on a bi-weekly basis. Plaintiffs note that the work they have performed is identical to work performed by other state employees who continue to be paid. The nature of their employment, except the fact that they have been classified as "legislative employees," has nothing to do with the State's failure to pay their wages.

As background, Governor Pataki took office on January 1, 1995 and has since repeatedly stated that he would take a series of actions if the legislature did not pass a timely budget by April 1, 1995. If the budget was not passed on time he stated that he would, along with other actions, refuse to take any steps necessary to pay members of the legislature and its employees. To date, the budget has not been passed and the Governor has carried out the plan to refuse payment to legislative employees while ensuring continuing salary payments to most employees of the executive and judiciary branches through supplemental appropriation bills.

Under § 40 of New York State Finance Law, appropriations cease to be effective on March 31 except for payment obligations incurred prior to the end of the fiscal year. As a result, historically, when budgets have not been enacted prior to the start of the fiscal year, the governor has submitted special appropriation bills which have provided money for salary payments to all state employees until passage of the new budget. On April 13, 1995, the Governor submitted a special appropriation bill to pay the salaries of certain employees in the executive, legislative and judicial branches for the period of March 23, 1995 to April 5, 1995. This bill covered the salaries of almost all state employees except a few in the executive chamber and certain officers and employees of the judiciary. In the legislative branch, however, the bill only covered the salaries of the legislative library employees, nurses and messengers. Plaintiffs presume that the library employees were paid because they are subject to the Fair Labor Standards Act, but assert that they cannot find a reason for the distinction made between the nurses and messengers and the other legislative employees who are not being paid. It appears, however, that this nonpayment of salaries will not affect employee benefits such as health insurance and retirement benefits. A letter by Sheldon Silver to legislative employees notes that according to the Civil Service Department and State Comptroller's Office all deductions for health and retirement benefits will be taken as soon as the Governor allows paychecks to resume. Pltf.Exh. at Affidavits Section; *see also* Pltf.Exh. B.

Under Article VII, § 5 of the New York State Constitution, in the absence of action on all the appropriation bills submitted by the Governor, the legislature may not consider any other appropriation bill "except on message from the governor certifying to the necessity of the immediate passage of such a bill." Therefore, without the Governor's consent by way of a message of necessity, the legislature has no power to appropriate money for the salaries of the legislative employees. Governor Pataki has repeatedly stated that he would not request an appropriation for the payment of such salaries and would not sign a bill providing for such salaries. Thus, plaintiffs contend that he will not issue a message of necessity for a special appropriation bill providing for such payment. Plaintiffs assert that Governor Pataki has been

able to prevent payment of their salaries through such inaction.

Plaintiffs also contend that because Governor Pataki has stated that he will continue to take action to prevent the appropriations until the legislature passes a budget, the Governor is withholding payment to plaintiffs and others in order to coerce the legislature into agreeing to his budget proposals. Plaintiffs point out the fact that they are powerless to strike or take action to protest this situation under the New York State Fair Employment Act, New York Civil Service Law § 200 et seq. (the "Taylor Law").

Defendants, on the other hand, assert that the legislature was free to add additional provisions to the appropriations bills they have already passed, and thus, they could have added language supplying payment for the legislative employees. Although they note that Governor Pataki was free to use his line-item veto against such changes to the appropriations bills, they state that the legislature could have overridden this veto by a two-thirds majority. Therefore, they blame the legislature for the problem.

Plaintiffs now seek a preliminary injunction requiring defendants to pay them, and others similarly situated, on a bi-weekly basis. They ask that the initial payment be made as of April 19, 1995 and bi-weekly thereafter pending the final outcome of this action.

## II. DISCUSSION

The court first notes that although not mentioned in the motion papers, this suit can be nothing other than an action pursuant to 42 U.S.C. § 1983, and the court will entertain it as such.

### A. Eleventh Amendment Bar

■ Defendants claim that this § 1983 suit, and the associated preliminary injunction motion, are barred by the Eleventh Amendment. Defendants argue that because the named defendants are the State of New York and Governor Pataki, named only in his official capacity, the plaintiffs seek to enjoin the State itself, an action barred by the Eleventh Amendment.

■ Clearly defendants are correct in their assertions regarding defendant New York State. There can be no argument but that the Eleventh Amendment bars suits against the states themselves whether brought by citizens of other states or citizens of the state named as a defendant. *Ex parte Young,* 209 U.S. 123, 149, 28 S.Ct. 441, 450, 52 L.Ed. 714 (1908). Accordingly, the court must dismiss the State of New York as a defendant to this action.

■ Defendants' application of the Eleventh Amendment is flawed, however, in regard to Governor Pataki as named in his official capacity. Case law makes clear that a suit against a state official in his or her official capacity, which is essentially a suit against the state itself, may be barred by the Eleventh Amendment regardless of whether injunctive or monetary relief is sought. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984). However, the Supreme Court has carved an exception to this rule finding that a "suit challenging the constitutionality of a state official's action is not one against the State." *Id.* Because this action clearly challenges the constitutionality of the Governor's actions, or inactions as the case may be, it is not barred by the Eleventh Amendment.

■ Moreover, the Eleventh Amendment does not bar this suit or the preliminary injunction sought here simply because they may cause expenditures from the state treasury. Eleventh Amendment principles bar actions against state officials to the extent that they seek an "award of an *accrued* monetary liability" in the form of retroactive payments. Nonetheless, actions against the state are proper insofar as they seek "payment of state funds as a necessary consequence of compliance *in the future* with a substantive federal-question determination." *Milliken v. Bradley,* 433 U.S. 267, 289, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977), *quoting, Edelman v. Jordan,* 415 U.S. 651, 667, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974). Thus, insofar as the plaintiffs here seek a preliminary injunction which will require the Governor to make all required future bi-

weekly payments from the date of a court order on this matter, it is not in violation of the Eleventh Amendment. The Eleventh Amendment can only bar injunctive relief insofar as it seeks payment of any bi-weekly checks already due. The ancillary effect on the state coffers which would be the result of a forward looking preliminary injunction is not a bar to the relief sought.

■ In reaching this conclusion, however, the court must also note that it is specifically barred under the Eleventh Amendment from granting relief against state officials, such as the Governor, based on alleged violations of state law. As the Supreme Court has noted, whether retroactive or prospective relief is sought, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Pennhurst*, 465 U.S. at 105, 104 S.Ct. at 911. Thus, insofar as the plaintiffs' suit and request for injunctive relief are based on alleged state law violations, such as alleged violations of New York Finance Law and state separation of powers doctrine, they are barred.

### B. Standard for Preliminary Injunction

■ In order to obtain a preliminary injunction in the Second Circuit, the movant must make a showing of: (1) irreparable harm; and either (2) likelihood of success on the merits; or (3) sufficiently serious questions going to the merits to make them a fair ground for litigation; and (4) a balance of hardships tipping decidedly in favor of the movant. *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). The defendants allude to Second Circuit case law which states that:

> where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood

that he will succeed on the merits of his claim.

*Plaza Health Lab., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989).

The court finds, however, that its examination in this case is not constrained only to the first two prongs of the *Jackson Dairy* test by the *Plaza Health* holding because the court does not see, nor have the defendants attempted to provide, a reason why the court should view the government actions at issue as part of a statutory or regulatory scheme taken in the public interest.

The *Plaza Health* rationale has been applied to actions involving statutes and their corresponding regulations which are set up in order to protect the public interest. *See, e.g., Union Carbide Agricultural Prods. Co. v. Costle*, 632 F.2d 1014, 1018 (2d Cir.1980) (applying the requirement to an action involving FIFRA); *Medical Soc'y of New York v. Toia*, 560 F.2d 535, 538 (2d Cir.1977) (applying this requirement to an action involving New York State Social Services Law). The case at hand, however, only involves the alleged failure of the Governor to make appropriations for the payment of wages to legislative workers. This can hardly be classified as part of a statutory or regulatory scheme, and has, at best, attenuated and dubious connections to the public interest.

■ Nevertheless, another consideration does lead the court to limit its review of the facts to the first two prongs of the *Jackson Dairy* test. It is clear that the preliminary injunction sought here is a mandatory rather than a negative injunction: plaintiffs seek a court order essentially commanding the Governor to appropriate funds for the payment of their wages until such time as a final decision on the merits is reached. "While ordinarily the function of a preliminary injunction is to preserve the status quo until a final determination upon the merits can be made, situations may arise which justify the issuance of those sorts of temporary injunctions that require the defendant[s] to take affirmative actions." *United States v. Midwest Solvent Recovery, Inc.*, 484 F.Supp. 138, 144 (N.D.Ind.1980).

Requests for mandatory injunctions are "cautiously viewed and sparingly used." *Ohio–Sealy Mattress Mfg. Co. v. Duncan,* 548 F.Supp. 75, 77 (N.D.Ill.1982). It has long been held that "mandatory injunctions ... are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Clune v. Publishers' Ass'n of New York City,* 214 F.Supp. 520, 531 (S.D.N.Y.1963). "Mandatory injunctions are not granted in doubtful cases in which the facts and law do not clearly favor the moving party." *Zurn Constructors, Inc. v. B.F. Goodrich Co.,* 685 F.Supp. 1172, 1181 (D.Kan. 1988). Thus, in order to properly issue a mandatory preliminary injunction there must be a strong showing of irreparable harm and a likelihood of success on the merits. Accordingly, the court will restrict its examination to these factors.

### 1. Irreparable Harm

Irreparable harm "means an injury for which a monetary award cannot be adequate compensation." *Jackson Dairy, Inc.,* 596 F.2d at 72. It is the most significant requirement for the issuance of a preliminary injunction. *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir. 1990). To make a proper showing of irreparable harm, the moving party must assert facts proving that the harm is imminent and not remote or speculative. *Id.* The Supreme Court has set up a particularly stringent standard for showing irreparable harm in cases involving the discharge of government personnel which has necessarily been adopted by the Second Circuit, and it is this line of cases on which the defendants rely to show that no irreparable harm is present in this case. *See Stewart v. United States Immigration & Naturalization Serv.,* 762 F.2d 193, 199 (2d Cir.1985) (citing *Sampson v. Murray, infra* ).

In *Sampson v. Murray,* 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), the Supreme Court stated that:

we have held that an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual.

*Id.* at 92 n. 68, 94 S.Ct. at 953 n. 68.

However, the Court was quick to add that it did "recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.*

As stated before, the defendants rely on *Sampson* and its progeny although these cases deal exclusively with situations involving the *discharge* of government employees. Obviously, none of the plaintiffs here have been discharged, and so, the application of the obdurate *Sampson* standard is extremely questionable even though the economic results of discharge are the same as those potentially faced by the legislative employees in this case. Thus, the court does not rely on this *Sampson* standard in this case.

Nonetheless, the *Sampson* Court pointed out that even under the regular irreparable harm standard, none could be found in a case like this. The Supreme Court cited favorably to *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958) which stated that:

mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Virginia Petroleum Jobbers Ass'n,* 259 F.2d at 925. This reasoning has also been adopted by the Second Circuit, *see Stewart,* 762 F.2d at 199, and it is this standard which the court applies to this case.

Although plaintiffs have attested to various forms of monetary harm, such as the inability to pay certain bills and rent on time, all the statements supplied by the plaintiffs are speculative in nature. No plaintiff has shown

that the harm that he or she attests to is either immediate or certain. Although several of the plaintiffs are responsible for the care of ill or disabled family members, and have stated that these individuals could suffer health problems if the plaintiffs could not pay for their health care and medication, it is not clear that such harm is likely. Plaintiffs are not being denied their regular health insurance coverage and it is not clear from plaintiffs' affidavits that the potential health care costs they allege would not be covered by their insurance or Social Security payments to the disabled individuals. Plaintiffs' attorney at oral argument could only speculate that certain medical bills which the plaintiffs might incur would not be covered by their health insurance. The court notes that this decision might be different had the Governor cut off medical insurance coverage to these plaintiffs. *Compare Gonzalez v. Chasen,* 506 F.Supp. 990, 999 (D.P.R.1980) (where plaintiff, whose son had a history of serious medical problems, would be deprived of his health care coverage if terminated from his job). Additionally, because the plaintiffs here continue to work, the stigma of job loss which is sometimes found to be irreparable harm in discharge cases does not come into play. *Compare Gonzalez,* 506 F.Supp. at 999; *Keyer v. Civil Serv. Comm'n of New York,* 397 F.Supp. 1362, 1370 (E.D.N.Y.1975).

Perhaps weighing most against plaintiffs' assertion of irreparable harm is the fact that employees affected by this situation have been provided with a number of alternative funding sources while passage of the budget is pending. Def.Exh. G. These include loans which eligible employees may take against Employees Retirement System contributions, various assistance programs set up by the State Employees Federal Credit Union, and cash reserve lines at the Albany Savings Bank which employees may apply for if they open an account with the bank. While the court believes these options are far inferior to the actual receipt of paychecks, it appears that they may help to decrease the economic harm to these employees. At oral argument, plaintiffs' attorney could only speculate that the plaintiffs might not be eligible for these programs, but could not

provide any proof. Thus, the court finds that the affidavits and information supplied at oral argument regarding plaintiffs' financial status are not sufficient to show irreparable harm.

■■■■ However, the court finds that another form of irreparable harm does exist. Normally, a temporary loss of earnings that can later be rectified is not irreparable injury. *Sampson* 415 U.S. at 88, 94 S.Ct. at 952. Nevertheless, the Second Circuit has specifically held that irreparable harm does exist where only pecuniary losses are at issue if a later federal court suit to recover monetary damages would be barred by the Eleventh Amendment. *United States v. State of New York,* 708 F.2d 92, 93 (2d Cir.1983); *Blum v. Schlegel,* 830 F.Supp. 712, 725 (W.D.N.Y. 1993). Such irreparable harm can be found regardless of whether state remedies exist because in assessing whether irreparable harm is present the court may only consider the available *federal* remedies. *State of New York,* 708 F.2d at 93; *Blum,* 830 F.Supp. at 725. Such irreparable harm exists in this case because should Governor Pataki choose not to later reimburse the legislative employees for their current work, the employees would have no recourse in federal court due to the Eleventh Amendment bar on suits for retroactive monetary damages against the states.

**2. Likelihood of Success on the Merits**

■■■■ The term "likelihood of success on the merits" has been articulated differently by the various circuit courts. The Second Circuit holds that in order to show likelihood of success on the merits, the party seeking a preliminary injunction must make a "clear showing of probable success." *Dopp v. Franklin Nat'l Bank,* 461 F.2d 873, 878 (2d Cir.1972); *Flood v. Kuhn,* 309 F.Supp. 793, 797–98 (S.D.N.Y.1970). However, it is not required that the moving party show that he will ultimately prevail on the merits. *Unicon Management Corp. v. Koppers Co.,* 366 F.2d 199, 204 (2d Cir.1966).

Plaintiffs here claim that the Governor has acted unconstitutionally based on four grounds. They claim that the Governor's

refusal to pay their salaries, is a violation of the Contract Clause of the United States Constitution, the equal protection and due process clauses of the Fourteenth Amendment, and the doctrine of separation of powers. The court has little difficulty in finding that the plaintiffs have established a showing of likelihood of success on their claim under the Contract Clause.

### a.) Contract Clause

The Contract Clause at Article I, § 10 of the United States Constitution provides that "[n]o state shall ... pass any ... law impairing the obligation of contracts." U.S. Const. art. I, § 10. Each plaintiff is employed by the year or by the legislative session at a certain rate of pay. Despite defendants' argument to the contrary, plaintiffs clearly work under contracts regardless of the lack of a written agreement. "A contract implied in fact is just as binding as an express contract arising from declared intention, since the law makes no distinction between agreements made by words and those made by conduct." 21 N.Y.Jur.2d Contracts § 4. Furthermore, "as a general rule, an employee who has performed services in accordance with a contract of employment has a right to recover either the amount expressly agreed upon for such services or, in the absence of such an agreement, the reasonable value of the services." 52 N.Y.Jur.2d Employment Relations § 253. The Contract Clause is applicable to both implied and express contracts. *See Crane v. Hahlo*, 258 U.S. 142, 146, 42 S.Ct. 214, 215, 66 L.Ed. 514 (1922) (stating that the Contract Clause applies to "contracts" as that term is known in the usual and popular sense "signifying an agreement of two or more minds, upon sufficient consideration, to do or not to do certain acts. Mutual assent [express or implied] to its terms is of its very essence").

Plaintiffs claim here that Governor Pataki has violated the Contract Clause by sending appropriation bills to the legislature which omit funds for the payment of the legislative staff. They claim that such impairment of the right to contract is substantial and the court finds strength in this reasoning in light of the Second Circuit's decision in *Association of Surrogates v. State of New York*, 940 F.2d 766 (2d Cir.1991). In *Surrogates*, the court found a substantial interference with the state's own contracts where the state instituted a system which essentially withheld ten percent of each employee's expected wages and postponed payment indefinitely. *Id.* at 772. In following this precedent, this court can only find an even more substantial interference with contracts as a result of withholding employees' entire paychecks for an indefinite period.

Additionally, the court is unlikely to find that such a substantial impairment of contracts is "reasonable and necessary to serve an important public purpose." *Id.* While the quick passage of the state budget can be viewed as an important public purpose, assuming for sake of this argument that it is the purpose, it is certainly far from clear that nonpayment of the legislative staff is a reasonable and necessary step to achieving this goal. The withholding of wages can only be seen either as a token showing of solidarity with the taxpayers who bear the ultimate financial brunt of an untimely state budget, as the defendants attest, or as a backhanded method of getting disgruntled employees to coax the legislators into adopting Governor Pataki's budget proposals more quickly, as the plaintiffs assert. In either scenario the withholding of plaintiffs' wages is not a reasonable and necessary step toward passage of the budget. It is far from necessary to make such a showing to the public. Furthermore, under New York law, state employees are banned from lobbying activities, and so, legally cannot attempt to coerce their employers into passing the budget. *See* N.Y.Legislative Law § 66–a (McKinney 1995 Supp.) (prohibiting lobbying by legislative employees). Thus, the court believes plaintiffs have shown a likelihood of success on the merits of their Contract Clause claim, for the Contract Clause "is especially vigilant when a state takes liberties with its own obligations." *Association of Surrogates*, 940 F.2d at 773.

### b.) Equal Protection Clause

After a review of the applicable case law, the court believes that although the plaintiffs raise a colorable issue under the

equal protection clause, the rational basis review which applies to nonsuspect classifications and nonfundamental rights prevents a finding that they are likely to prevail on the merits. *See Heller v. Doe,* —— U.S. ——, ——–——, 113 S.Ct. 2637, 2642–43, 125 L.Ed.2d 257 (1993) (outlining the low standard of rational basis review).

### c.) Separation of Powers

■ Plaintiffs also assert that the Governor's actions, or lack thereof, conflict with the separation of powers doctrine. They rely solely on New York constitutional principles for this argument, and thus, the court cannot find a likelihood of success on the merits, for as stated previously, the court cannot enjoin the Governor based on alleged violations of state law. Such action is specifically barred under the Eleventh Amendment because it produces results in direct conflict with the principles of federalism. *Pennhurst,* 465 U.S. at 105, 104 S.Ct. at 911. Thus, there is obviously no likelihood of success on the merits.[1]

### d.) Procedural Due Process

■ Plaintiffs assert that they have a property right in their wages which is being denied for a constitutionally impermissible purpose: the coercion of state legislators. They also note that the Governor has denied this property right without any process for review of the denial. Defendants, however, point to the fact that the right to biweekly salary payments is derived from New York Finance Law § 200 which is only enforceable in light of Article VII, § 7 of the New York Constitution which states that "[n]o money shall ever be paid out of the state treasury or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law." N.Y. Const. art VII, § 7. Due the court's view that both parties have asserted viable arguments, it cannot find that the due process claim is likely to succeed on the merits, and so, this claim cannot form the basis for injunctive relief.

Nonetheless, as stated previously, the Contract Clause claim presents a sufficient showing of likelihood of success on the merits to allow the court to issue injunctive relief.

### C. Additional Concerns Regarding Preliminary Injunctive Relief

■ Despite the court's finding of grounds for injunctive relief, it remains concerned about its jurisdictional ability to grant the type of mandatory injunction sought by the plaintiffs. Plaintiffs essentially seek a court order which will force Governor Pataki to send to the legislature messages of necessity and appropriation bills including funds for the bi-weekly payment of the legislative employees until the budget is passed. First, it is important to note that the court does not have jurisdiction over all the parties necessary to assure payment of these employees. Clearly, both the Governor and the legislators play separate roles in the passage of appropriation bills. Given the fact that only the Governor is a defendant, the court's ability to order the payment of the legislative employees is incomplete. While the court might arguably be able to order the Governor to draft an appropriation bill including the plaintiffs, deliver a message of necessity regarding the bill, and order his signature of the bill upon passage by the legislature, it has no power to order the legislators to vote in favor of such a bill. Thus, the court would not have the power to fully enforce any preliminary injunction it had fashioned against Governor Pataki simply requiring that he pay the employees. *See Maggio v. Zeitz,* 333 U.S. 56, 74, 68 S.Ct. 401, 411, 92 L.Ed. 476 (1948) (noting that in a contempt hearing the court must examine the alleged contemnor's ability to comply with the court order at issue and whether failure to comply was due to deliberate indifference); *see also* Fed. R.Civ.P. 65(d) (stating that a preliminary injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise").

---

1. Similarly, any claim that the court should enjoin the Governor due to his alleged violation of New York State Finance Law is barred on the same grounds, as previously noted, and cannot be likely to succeed on the merits.

Even though legislators might vote against such an appropriation bill, they could not validly be held in contempt as persons in active concert or participation with the Governor under Fed.R.Civ.P. 65(d). *See Thaxton v. Vaughan*, 321 F.2d 474, 478 (4th Cir. 1963) (holding that city council members could not be held in contempt on such grounds because "members of the City Council must exercise their individual judgment and discretion when the act, decide, and vote as members"); `but see City of Yonkers v. United States*, 487 U.S. 1251, 109 S.Ct. 14, 101 L.Ed.2d 964 (1988) (noting that a federal court may require officials to vote in a certain manner in order to remedy constitutional violations on which the court has made a final ruling). Thus, the court would have incomplete jurisdiction to enforce such a preliminary injunction.

■■■■■ Furthermore, after exhaustive research, it appears that the court may not order the appropriation of state funds without a final judgment holding that a constitutional violation has occurred. While the court has found no direct authority for the notion that it cannot order such appropriations at the preliminary injunction stage, a variety of Supreme Court decisions persuade the court of this fact. *See, e.g., Milliken*, 433 U.S. at 289, 97 S.Ct. at 2762 (allowing a prospective injunction which required defendants to conform their conduct to federal law after a Fourteenth Amendment violation was found). The Supreme Court has clearly stated that there are fundamental limitations on the remedial powers of the federal courts to restructure the operation of state government. This power is not plenary, but rather, may only be used upon the finding of a constitutional violation. *Hills v. Gautreaux*, 425 U.S. 284, 292, 96 S.Ct. 1538, 1544, 47 L.Ed.2d 792 (1976); *Milliken v. Bradley*, 418 U.S. 717, 737, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974) (noting that federal remedial powers may only be used upon the finding of a constitutional violation). Thus, while the federal courts have broad powers to interfere in state government workings once a constitutional violation has been conclusively found, it is not clear that the courts may order such interference at the preliminary injunction stage. This is especially true in light of the

fact that ordinarily a preliminary injunction is meant to preserve the status quo until a final hearing upon the merits rather than effectively grant the relief ultimately sought. *See Jordan v. Wolke*, 593 F.2d 772, 773–74 (7th Cir.1978) (in which a mandatory preliminary injunction which called for the building of new prison facilities was struck down by the circuit court).

In *Jordan v. Wolke, supra*, the district court ordered the building of new jail facilities as a preliminary measure until a full hearing on the merits of plaintiffs' due process and equal protection claims could be heard. The circuit court, in reversing the district court, noted that the federal courts could not order the state to appropriate money for prison reform. *Id.* at 775. While the basis for this statement is unclear, this court believes that the underlying rationale is tied to the fact that the federal courts may only require the state to indirectly take such action after a constitutional violation has been conclusively found. *See Holt v. Sarver*, 309 F.Supp. 362, 385 (E.D.Ark.1970) (where although the court did not directly order the state to appropriate funds for prison reform, it ordered that if the prison system was to continue operating it would have to do so in a constitutional manner). Thus, the court in this case finds that it cannot require the Governor, as part of a preliminary injunction, to appropriate funds to pay the legislative workers.

This finding does not leave the court powerless to act, however. Based upon the court's finding of irreparable harm and likelihood of success on the merits of the Contract Clause claim, plaintiffs have established their right to a preliminary injunction consistent with principles of federalism. In keeping with the spirit of the relief requested by the plaintiffs, and mindful of the limitations on mandatory injunctive relief as outlined herein, the court finds that although it may be unable to require the Governor to seek the appropriation of state funds, it can lawfully require the Governor to include the legislative employees in any further appropriations for the payment of state employees that he does seek.

828

Thus, the court orders that insofar as the Governor undertakes to send future appropriation bills and messages of necessity to the legislature for the payment of state workers, he may not exclude payment to legislative employees from such bills, and a portion of these same funds must be allocated for the payment of legislative employees. This is not to say that the Governor must allocate additional funds to pay these individuals, but any funds he does seek for the payment of state workers must be divided to include the legislative employees as well.

**IT IS SO ORDERED.**